*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 27, 2016

**BY EMAIL AND HAND**

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

>   Re:   *United States* v. *Laquan Parrish* et al.
>         S1 16 Cr. 212 (LAK)
>
>         *United States* v. *Nico Burrell* et al.
>         S2 15 Cr. 95 (AJN)

Dear Judge Kaplan and Judge Nathan:

The Government respectfully submits this letter in connection with today's unsealing of the above-referenced Superseding Indictments (the "Indictments"). This letter provides factual background to the Indictments, outlines anticipated discovery, and proposes certain scheduling procedures for these matters in light of the Second Circuit's decision in *United States* v. *Casamento*, 887 F.2d 1141 (2d Cir. 1989).

**I.    Background**

On April 27, 2016, the Government unsealed the Indictments, which charge a total of 120 defendants with: (a) racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d); (b) narcotics conspiracy, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A); (c) narcotics distribution within 1000 feet of a school, playground, or public housing development, in violation of Title 21, United States Code, Section 860; and/or (d) firearms discharge, in violation of Title 18, United States Code, Section 924(c)(1)(a)(iii).

The Indictments arise from a joint investigation by the New York City Police Department (the "NYPD"), Homeland Security Investigations, the Drug Enforcement Administration, and the Bureau of Alcohol, Tobacco, Firearms & Explosives into two warring street gangs in the Northern Bronx: the 2Fly YGz ("2Fly") and the Big Money Bosses ("BMB").  The rivalry between 2Fly and BMB—as well as with other rival gangs, such as the "Slut Gang," which is based at the Boston Secor housing development, and the "YSGz," who are based at the Edenwald housing development—has led to an enormous amount of fatal and non-fatal violence between 2007 and the present in the Northern Bronx, including shootings, stabbings, slashings, beatings, and robberies. The Indictments list certain of the murders under investigation, including homicides of rival gang members and bystanders caught in gang crossfire.

2Fly is a subset of the "Young Gunnaz," or "YG" street gang, which operates throughout New York City.  2Fly is based in the Bronx, within and around the Eastchester Gardens housing development ("ECG") and in an area called the "Valley" or the "V," which is in the vicinity of Gun Hill Road.  ECG is a rectangular complex of residential buildings bordered by Burke, Adee, Yates, and Bouck Avenues, in the middle of which is a playground.  Members and associates of 2Fly control the narcotics trade at ECG, which takes place in the open air at the playground and in apartments at ECG.  2Fly primarily sells marijuana and crack cocaine, but also sells powder cocaine and prescription pills, such as oxycodone.  2Fly members and associates store guns at the playground or in nearby apartments or cars in order to protect the narcotics business and for protection against rival gangs. The case of *United States* v. *Laquan Parrish et al.*, S1 16 Cr. 212 (LAK), charges 57 members and associates of 2Fly, including its "Big Guns," or leaders: Laquan Parrish, a/k/a "MadDog," a/k/a "Quanzaa," Andre Bent, a/k/a "Dula," and Aaron Rodriguez, a/k/a "Gunz" a/k/a "Cito."  2Fly coexists at ECG with a faction of the Bloods street gang called "Sex Money Murder" ("SMM"), which controlled ECG before 2Fly and has allied with 2Fly to prevent others from selling drugs at ECG.  Two of the leaders of SMM at ECG—brothers Preston Pasley, a/k/a "Fresh," and Terrence Pasley, a/k/a "Smoove"—and several of its members are also charged in the *Parrish* Indictment.

BMB is a subset of the "Young Bosses," or "YBz" street gang, which operates throughout New York City.  BMB—whose members also sometimes refer to themselves as the "Money Making Mafia" or "Triple M"—operates primarily on White Plains Road from 215th Street to 233rd Street in the Bronx.  BMB's narcotics trafficking activity is based principally in the vicinity of White Plains Road and 224th Street, an open-air drug spot that is referred to by gang members as the "Forts."  BMB members also operate a drug spot on Boston Road and Eastchester Road in the Bronx, which they refer to as "B Road."  BMB members who work principally at the B Road spot typically refer to themselves as "Blamma."  BMB members and associates primarily sell marijuana and crack cocaine.  The case of *United States* v. *Nico Burrell et al.*, S2 15 Cr. 95 (AJN), charges 63 members and associates of BMB, including the leaders of BMB: Nico Burrell, a/k/a "Zico Nico," and Douglas Mclarty, a/k/a "Q-Don," a/k/a "Q-Dizzy."

The investigation into both gangs is ongoing.  The Government expects to seek Superseding Indictments in each of the *Parrish* and *Burrell* cases charging multiple acts of violence in aid of racketeering, including murders in aid of racketeering, conspiracies to commit murder in aid of racketeering, and assaults and attempted murders in aid of racketeering, among other offenses.  The Government notes that, in addition to the five murders listed in the

Indictments, the Government is also investigating: (a) the murder of Darren Epps, who was shot and killed at the age of 47 by a member of 2Fly in the vicinity of 215th Street and White Plains Road during a botched robbery on March 13, 2016; (b) the murder of Jordan Jackwett, who was shot and killed at the age of 23 during a shooting between members of 2Fly and BMB on July 26, 2015; (c) the murder of Fabian Pennant, an associate of 2Fly, who was shot and killed at the age of 24 in the vicinity of Eastchester Road by a member of BMB on October 22, 2014; and (d) the murder of Andre Hanson, who was shot and killed at the age of 26 in the vicinity of 225th Street and Laconia Avenue on April 6, 2014.

## II.     Discovery

Discovery produced pursuant to Rule 16 of the Federal Rules of Criminal Procedure ("Rule 16") in each case will be voluminous and is expected to include the following:

- *Wiretap Material*: The investigation involved multiple wiretaps. For the 2Fly case, the Government intercepted seven telephones, including Parrish's phone. For the BMB case, the Government intercepted four telephones, including Burrell's phone. There will be thousands of draft line sheets produced in each case. In order to assist defense counsel in its review of the material, the Government will identify—on a preliminary basis, based upon the Government's current understanding—line sheets relating to particular defendants. As additional defendants are identified on the wiretaps, the Government will update counsel promptly. The Government will also identify any calls that it intends to introduce as evidence at trial reasonably in advance of trial. In addition to the foregoing, the Government will produce the application materials for each wiretap.

- *Material Related to Controlled Purchases of Narcotics*: Both investigations involved numerous controlled purchases of narcotics by undercover police officers or confidential informants. The Government will produce any video or audio recordings and buy reports related to these purchases.

- *Social Media*: The Government sought and obtained warrants for over one hundred Facebook, Twitter, or Instagram accounts, and has downloaded numerous publicly-available YouTube videos. The Government will produce application materials and the returns relating to each gang. The Government is awaiting some of these returns and will produce them promptly upon receipt.

- *Contents of Cellular Phones*: Pursuant to search warrants, the Government searched and is in the process of searching numerous cellular phones belonging to gang members and associates. The Government will produce the application materials and reports of the contents of the phones on a rolling basis.

- *Prison Calls and Emails:* The Government obtained prison calls and emails from state and federal facilities for certain defendants in each case and will produce them.

- *Police Files*: To the extent the Government has identified particular fatal or non-fatal acts of violence that it intends to prove at trial in connection with the charged racketeering

Case 1:15-cr-00095-AJN   Document 185   Filed 04/29/16   Page 4 of 7

Page 4


conspiracy and/or intends to charge substantively in a Superseding Indictment, the Government will produce any Rule 16 material in the Government's possession, custody, or control, such as arrest reports, invoices of seized evidence, ballistics reports, and photographs.  As additional acts of violence are identified, the Government will produce related discovery on a rolling basis.

- *Pen Register and Location Information*: The Government applied for and obtained pen register, GPS, and cell site data for certain defendants in each case.  The Government will produce the application materials for this data and, as is customary due to the volume of data, will make the location data available for counsel to inspect.

- *Location Search Warrants*: The Government expects to search at least four residences today and expects to search numerous cellphones in the following days.  The Government will produce invoices of seized evidence and any reports of electronic searches, as well as associated application materials.

- *Individual Discovery*: The Government will produce certain material individually, including criminal history reports, U.S. Marshal's Service Intake Forms, and arrest reports, including reports of any post-arrest statements.

The Government expects to produce the above-referenced categories of discovery within 30 days in each case.  As stated above, however, this investigation is ongoing.  Accordingly, the Government will continue to produce discovery on a rolling basis.

In other cases of this magnitude, defense counsel have moved early in the case to have a coordinating discovery attorney appointed to coordinate the production of material to counsel and the jails and assist defense counsel in the review of discovery.  The Government believes such an appointment would be beneficial in these cases.  A coordinating discovery attorney should be appointed sufficiently in advance of the Government's discovery deadline to be able to assist defense counsel meaningfully.

**III.     Scheduling**

The Government proposes below for the Court's and counsel's consideration a scheduling procedure based upon those employed by the Honorable Paul A. Engelmayer, United States District Judge, in *United States* v. *Leonides Sierra et al.*, 11 Cr. 1032 (PAE), and by the Honorable Colleen McMahon, Chief United States District Judge, in *United States* v. *Anthony Boykin et al.*, 10 Cr. 391 (CM), which were close analogs to *Parrish* and *Burrell* with respect to the number of defendants and type of charges.  As Judges Engelmayer and McMahon accomplished in *Sierra* and *Boykin*, our proposal is intended to move the cases expeditiously toward trial, utilize judicial and governmental resources efficiently, and afford sufficient time for defendants to review the voluminous discovery and reach pretrial dispositions where appropriate, as well as to avoid: (a) a single defendant facing multiple trials; (b) trials of more than three months in length;[1] or (c) more than five defendants per trial.  This schedule is also expected to

---

[1] Based upon the investigation to date, and the Government's experience in other cases of this magnitude, it is unlikely that any trial—including any murder trial—would last more than one to

afford sufficient time for the Government's investigation to proceed and for review by the Capital Case Unit of the Department of Justice and associated mitigation submissions, if any, for the capital offenses expected to be charged in Superseding Indictments against certain of the defendants.

In particular, we propose the following procedure:

- At the initial pretrial conference in each case, the Court should:

    o Set a deadline of 30 days for the Government to produce discovery, with any additional discovery to be produced promptly on a rolling basis. Defense counsel should move to have a coordinating discovery attorney appointed sufficiently before the Government's discovery deadline, so that the attorney can meaningfully assist counsel with discovery.

    o Schedule a pretrial conference in approximately five months. In advance of this conference, the Government will send a letter to the Court proposing a severance of the case into two groups, the former of which can proceed to trial at the Court's convenience in groups of five or fewer--that the Government will propose at that time in order to maximize judicial and governmental efficiency--and the latter of which is likely to face additional charges in a Superseding Indictment.

- At the second pretrial conference in each case, the Court should:

    o Rule on the Government's proposal for severance of the case into two groups, and set trial dates and a motions schedule for the group of defendants against whom the Government does not intend to add additional charges in a Superseding Indictment.

    o Set a conference approximately one year from the date of the initial pretrial conference at which trial dates and a motions schedule will be set for the defendants against whom a Superseding Indictment is sought. The Government will endeavor to return a Superseding Indictment in advance of this conference. The Government expects that, prior to the filing of a Superseding Indictment, the Capital Case Unit will have completed its review of those defendants who will face capital offenses in that Indictment.

As stated above, this procedure is based on those followed by Judges Engelmayer and McMahon, respectively, in the *Sierra* and *Boykin* cases. An overview of the procedural history of these cases illustrates how they met the goals of efficiency and fairness to all parties and are consistent with Government's proposal here.

In the *Sierra* case before Judge Engelmayer, in December 2011, approximately 50 members and associates of the Trinitarios street gang were charged with racketeering conspiracy,

---

two months. The Government references a figure of three months as a conservative estimate. In the unlikely event that the estimate changes so significantly that a four-month trial appears likely, the Government will advise the Court and counsel promptly. *See Casamento*, 887 F.3d at 1152.

narcotics conspiracy, and/or firearms charges. After the Government had the opportunity to produce discovery, the defense had the opportunity to review discovery, and the parties began discussions in many instances regarding pretrial dispositions, on May 30, 2012, the Court granted the Government's motion to sever the case into two equal groups: (a) a group of 25 defendants, "Group A," against whom the Government did not intend to add additional charges in a Superseding Indictment, and for whom the Government proposed trial dates be set; and (b) a group of 25 defendants, "Group B," involved in acts of violence that the Government expected to include in a Superseding Indictment. The Court set trial dates in early 2013 for the defendants in Group A, all of whom subsequently pled guilty. With respect to Group B, Judge Engelmayer set a deadline for Superseding Indictments of December 2012. The Government obtained a Superseding Indictment in December 2012 charging substantive racketeering offenses, including nine murders in aid of racketeering, and adding 26 new defendants. In the Spring of 2014, two defendants from Group B went to trial, which lasted approximately seven weeks. In the Fall of 2014, three defendants from Group B went to trial, which lasted approximately three months.

In the *Boykin* case, in May 2010, approximately 60 members and associates of the Newburgh Bloods street gang were initially charged with narcotics offenses. Judge McMahon held the second pretrial conference in September 2010. At that time, Judge McMahon adjourned to December 2010, allowing the defendants to make any motions related to the applicability of the Fair Sentencing Act of 2010, which applicability was, at the time, undecided. Judge McMahon then adjourned, allowing defendants to file any pretrial motions, which they did, and indicating that she would render her decisions on any pretrial motions at conferences in late March and early April 2011. Additionally, Judge McMahon ordered the Government to update the Court on a prospective superseding racketeering indictment. In January 2011, the Government wrote to Judge McMahon, setting forth the racketeering acts it was investigating, and indicating that it had told defense counsel who it was, and was not, considering superseding against for racketeering violations. In light of the nature and timing of the pretrial motions, and the ongoing need for defendants to enter guilty pleas, Judge McMahon adjourned the conferences to May 2011. At that time, Judge McMahon set a trial date of December 2011. In September 2011, when there were nine original defendants remaining, the Government superseded to add racketeering and/or capital charges against four of the original defendants and eleven new defendants. Judge McMahon, with the consent of the Government, severed the 15 racketeering/capital defendants from the five non-racketeering/capital defendants, and kept the December 2011 trial date for those five defendants. One defendant ultimately went to trial in December 2011. In October 2011, Judge McMahon appointed learned counsel to the capital defendants and adjourned to January 2012. In January 2012, the Government announced that it would not seek the death penalty against any defendants, and, in order to accommodate the schedules of the racketeering defendants' counsel, Judge McMahon scheduled trial for February 2013. In February 2013, the two defendants who had not pled guilty went to trial.

The Government notes, in conclusion, that it intends to submit to the Court and the defendants so called "enterprise letters" during the course of these cases. As the Court is aware, these are letters routinely provided by the Government in racketeering cases that list the particular acts of violence that the Government expects to prove at trial in connection with the racketeering conspiracy charge. Initial enterprise letters were submitted in the *Sierra* case in August 2012 (approximately seven months after the initial charges), and in the *Boykin* case in

October 2011 (approximately seventeen months after the initial charges). The Government respectfully proposes to provide an initial enterprise letter in each of *Parrish* and *Burrell* in October 2016 (approximately six months after the initial charges), with any supplementary enterprise letters to be provided thereafter as the investigation progresses.

The Government will be prepared to address the issues raised in this letter or any inquiries from the Court at the pretrial conferences scheduled in each case.

Finally, we note that we have copied United States Magistrate Judges James C. Francis IV, Debra Freeman, Frank Maas, and Henry Pitman, who will be presiding over the presentments and arraignments in these cases today, to provide additional background for them.

Respectfully submitted,

PREET BHARARA
United States Attorney


By:        /s/
    Rachel Maimin
    Micah W.J. Smith
    Hagan Scotten
    Jessica Feinstein
    Drew T. Johnson-Skinner
    Assistant United States Attorneys
    (212) 637-2460/2439/914-993-1924/1946/1587


cc: All defense counsel
    The Honorable Debra Freeman
    The Honorable James C. Francis IV
    The Honorable Frank Maas
    The Honorable Henry Pitman